Thank you, Your Honors. My name is Susan Jane Brown, and I'm with the Western Environmental Law Center, and I represent plaintiffs and appellants in this case, Cascadia Wildlands and Oregon Wild. I'd like to reserve about three minutes for rebuttal, please. Good morning. Those who forget their history are doomed to repeat it. In the late 1980s and the early 1990s, this court and its district courts enjoined timber harvest across the range of the Northern Spotted Owl for what Judge Dwyer at the time called, quote, a remarkable series of violations of the environmental laws stemming from the federal government's unwillingness to see the writing on the wall and act to protect the Northern Spotted Owl. Those were clear cuts, weren't they? They were, Your Honor. And this is a rehabilitation of forest that's been subjected to fire. Your Honor, that is true. These are areas that have been burned in a wildfire, but the civil culture prescriptions that are being prescribed here are also clear cuts. All of the trees that have been burned in the fire in the particular harvest unit will be removed. Any trees that have been burned in the wildfire, known as snags, would be retained at the edge of the units. So interior to the areas that are actually removed. It seemed like from the briefing that most of this was done. Is it moot or is there anything left? Your Honor, as far as I know, there certainly has been logging activity ongoing. This is a P.I. appeal, preliminary injunction appeal. So we did not prevail in the district court. So logging has been ongoing. But my understanding is that there is still some timber harvest left to occur in this case. If you would like to discuss mootness, I would be happy to discuss that. But as you know, the hallmark of mootness is when no effective relief can be granted at all. And since there is still a major federal action underway here, there's relief that can occur as well as declaratory relief. But if everything were all done and they weren't doing anything else, wouldn't that certainly raise mootness? I'm just wondering. There may still be things that are ongoing. I don't know. Yes. I think that if that was the situation, then mootness may be at issue. But here in this case, there is activity, harvest activity left to occur as well as post-harvest activity left to occur. So mootness is not at issue and has not been raised by the other parties in this case. Okay. Well, you appear to argue that the Fish and Wildlife Service's spotted owl survey data is imperfect due to the presence of barred owls. While that may be so, but does the ESA require agencies to create a methodology in order to account for potential shortcomings of existing data? No, Your Honor, it does not. The ESA does not require the agency to create new studies or create new information, but nor has Cascadia asked the federal government to do so in this case. The ESA has acknowledged that the best available science in this case says that when there are barred owls present, the spotted owl tends to not respond to calls, which means a site may be occupied. There may in fact be spotted owls in that site, but because they keep quiet because of the competitive species that's out there, you may end up with survey results that are not actually accurate. Now, what should have occurred in this case is the Fish and Wildlife Service should have acknowledged that, yes, this is what happens, and the way that we have addressed that particular issue is by XYZ, which then would indicate that the Section 7 Jeopardy analysis did in fact take into consideration and did use, as the ESA requires, the best available science in this case. So is your argument that the Fish and Wildlife Service did not take into account the presence of the barred owl in conducting the surveys? Your Honor, our argument is that the federal government, the Fish and Wildlife Service, says, yes, we know this is a problem. They still did surveys. There is survey data out there, but it's really incomplete. It doesn't paint a clear picture of what may be going on out on the ground. But isn't that really a disagreement with the way the survey was conducted rather than whether or not it was the best available science? Not at all, Your Honor. We agree that surveys are, in this case, the best available science that's out there. We're not asking for different kinds of surveys or anything like that. The point is that there should have been some sort of logic trail where the Fish and Wildlife says, we know this is a problem. Here's how we're addressing it in our ESA consultation. And that critical step was never made in this case. And, in fact, Fish and Wildlife has never argued in any way, shape, or form that it has done that. Now, it could have done it in a myriad of ways. Of course, it's not plaintiff's obligation here to suggest how that should have been done, but it could have been done in many different ways. Fish and Wildlife could have said, you know, we are going to expand the analysis area that is here. We're going to do more surveys. We're going to do them at different times of the year. We're going to do them in different methods, different manners. Any of these things could have been how Fish and Wildlife responded to this issue. So the District Court determined that the Fish and Wildlife Service fully considered the possibility that the Isle may have expanded or shifted its core use areas and home ranges post-fire. Yes, Your Honor. What was wrong with that conclusion by the District Court? Your Honor, the District Court was factually incorrect about that. And our argument here is that you have to do more than simply cite what the best available science is in your biological opinion. Cascadia agrees that the best available science regarding this issue of expanding and shifting spotted owl home ranges, that yes, there's a nice description in the biological opinion about that science and about how owls do move post-fire. But instead, what you see in the biological opinion is jeopardy analysis that was based on owls that don't move. It's based on information for owls that use unburned forests. The provision of the ESA or regulation requires a BIOP to address recovery measures in determining whether a federal agency action will cause jeopardy. Your Honor, this issue is actually an issue of administrative law. I mean, isn't jeopardy, which is the subject of a BIOP, different than recovery, which is the subject of a recovery plan? Aren't those two different things? I think Judge Hawkins was sort of referring to that one. Yes, Your Honor. So the issue about the recovery plan here, and Cascadia has been very clear throughout this case, that we are not arguing per se that recovery plans are binding and that they are enforceable. Instead, what we are doing is arguing that the principles of administrative law, which say that if an agency has a consistently held view, which in this case is the best available science in the recovery plan for the spotted owl, that's a consistently held agency view, these are the things that Fish and Wildlife thought was necessary to recover the species, and then suddenly Fish and Wildlife departs from those recommendations, then it is obligated under administrative law principles to explain why. And there is no indication anywhere in this administrative record why Fish and Wildlife Service has suddenly decided that Recovery Actions 10 and 12 are things that we don't really have to pay attention to when we're looking at the impacts of a federal action on the spotted owl. So that presupposes that they did not pay attention to Recovery Actions 10 and 12? Your Honor, there must be an explanation for why they deviated from that consistently held view. Okay, so your view is they deviated. Does the service agree that they deviated from those plans? You would have to ask the services that question. In the district court, did they agree? In the district court, they stated that meeting the intent of Recovery Actions 10 and 12 proved very difficult in this consultation process. And I would agree that, in fact, it has been very difficult. I would say impossible. The Recovery Actions 10 and 12 are very clear in terms of what must be considered. But you don't have to meet them. That's just ideally what the forest will attempt to do, right? Yes, Your Honor. There must be an explanation for why you're not following that direction. What case says that, that there must be an explanation for why you're not adhering strictly to the recovery plans? Right. Is there a case that says that? Yes, Your Honor. And I would point you to the, there are a couple cases here. What's the strongest one? There's the Bartell case that we cited. This is a, it's a district court case, 470 F SUP. Your strongest case is a district court case? Of course you know we're not bound by that. Yes, Your Honor. It's a useful and instructive case because it talks about a recovery plan in this context. But there is quite a bit of Ninth Circuit precedent, including Supreme Court precedent. I would refer the court to FCCV Fox television stations, which is 556 U.S. 502. Is that an ESA case? No, it is not, Your Honor. It's an administrative law case. Well, I was asking the question about what's your best case authority for the proposition that it's, that agencies are required to explain any deviation from the recovery plan. Then I would refer, Your Honor, to National Wildlife Federation v. National Marine Fishery Service, which is the Ninth Circuit case, 422 F third 782. That's in your brief? Yes, it is. 422 F third? 782 at 799. Okay. It's 2005, Ninth Circuit case. But it sort of seems that, I mean, Congress requires the agency to report every two years on the status of efforts to develop and implement recovery plans. But I don't think it necessarily follows that you can compel either the FWS or an accident agency to carry out individual recovery actions or other statements in a recovery plan. I'm not, I'm not seeing that. And that has not been our argument in this case, Your Honor. Our argument has been if you're going to change direction, if you're a federal agency like Fish and Wildlife Service, and you said, this is what we think needs to occur to recover the spotted owl, and you decide not to continue on that pathway, you decide to deviate and do something different, then you need to explain why that best available science is no longer the best available science. That's why I asked you the question as to whether or not Fish and Wildlife did deviate from those plans. And that's when you're saying it was difficult for them to comply, but you never made the statement that they actually deviated from the plan. Let me get to that then, Your Honor. Let's look at Recovery Action 10. Recovery Action 10 says, quote, conserve spotted owl sites and high-value spotted owl habitat to provide additional demographic support to the spotted owl population. And that includes current as well as historically occupied sites. Now what Fish and Wildlife Service did here was rank the high-priority sites. And I would point out that a ranking is not conservation, which the recovery plan defines as conserve or to preserve for use. So a ranking is not conserve. And second, Fish and Wildlife, despite this ranking, then went ahead and authorized the take of five high-priority sites. So even if a ranking is consistent with Recovery Action 10, and Recovery Action 10 says nothing about a ranking, turning around and then authorizing the take of five high-priority sites is certainly not, is not conserving spotted owl sites. But that, to me, that's a disagreement with the methodology that was used. I would disagree, Your Honor. It's pointing to the outcome of whatever process Fish and Wildlife Service has used. It used a ranking process. It said, in order to meet RA 10, we're going to rank, and then we're going to conserve those high-priority sites. So are you going so far as to say, though, that the BIOP must ensure that the timber harvest is consistent in all respects with the individual recovery actions set forth in the recovery plan? No, Your Honor. That's not what we're saying. We're saying that if the agency decides to not follow its own best available science, which acknowledges is the best available science, which is what the ESA requires, it requires the use of the best available science, not simply citing to it. So if you're going to deviate from that use, you must explain why. And there has been no explanation. But you're saying they did use the best available science. I'm sorry? But you're saying they did use the best available. You're not, you haven't said, you haven't proposed any other best science, right? No, Your Honor. And that's, that's not our burden here. We agree this is the best available science. Our argument is, if you're, then you need to use it. And if you are not going to use it, you have to explain why. So then that's methodology, like what Judge Rawlinson said. You're disagreeing with the methodology, not the best available science. I would just, I would, I would say that we disagree with the application, how that best available science has in fact informed the Jeopardy analysis, Your Honor. In response to an earlier question, you cited the Bartels case? Bartel, yes. And I don't find it in your briefs. I'm pretty, I'm almost positive. And I see that I've got about a minute and 15 left. So maybe I can reserve my time and locate it in our briefs and let you know on my rebuttal. Maybe Bartels is the second party as opposed to the first party. It is. Yeah, it's Fish and Wildlife Service, I believe is the initial, but I'll look at it for you. All right. You want to save your remaining time for rebuttal? Yes, please, Your Honor. All right. Thank you, counsel. We'll hear from the government. So are you the 10 minute? I am. Could you please put 10 minutes on, Madam Clerk? Thank you. Thank you, Your Honor. You want to go up? No. Thank you, Your Honor. I think this will work. You can hear me. Oh, she can help you. That's great. Thank you. May it please the court. I'm Elizabeth Ann Peterson and I represent the Fish and Wildlife Service. Could you speak right up? Yes. My name is Elizabeth Ann Peterson and I represent the Fish and Wildlife Service in this case. A preliminary injunction is a drastic and extraordinary remedy and it can be awarded only on the showing of four factors required. In this case, none of those factors has been satisfied and the district court therefore denied preliminary injunctive relief and this court should affirm that judgment. So is there still stuff to be done? So, or is this moot? Your Honor, there is still some stuff to be done and I would like to defer the details of that question to my co-counsel who represents the contractors who are the on the ground. Well, I just want to make sure that this isn't moot, that we're not going through a whole lot of hoops or nothing. I understand, Your Honor. And I do agree that the case isn't technically moot. There is a good argument. I believe that there is no longer any ability for an order for a preliminary injunction to benefit owls. Almost all of the logging has actually been done. The trees have been felled and most of the work that remains is either outside suitable owl habitat or is on the ground kinds of work that doesn't directly affect owl sites in the manner that I think the original preliminary injunction that was sought would have intended. Do you argue that the recovery plan has no legal effect here? No legal effect might be going too far, Your Honor. The recovery plan is not an enforceable document, but it is an important policy document and it guides actions of the agencies that are managing lands within spotted owl habitat in a manner to direct those activities as best possible toward the recovery of the owl. This case, though, challenges the biological opinion, the only purpose of which is to determine whether the action under consideration will jeopardize the species. But opposing counsel has tied that in to Recovery Actions 10 and 12 and said that the biological opinion does not reflect that the agency used the best available science that it had identified as negating jeopardy or preventing jeopardy. What's your response? For one thing, the best available science that was incorporated into the recovery plan appears in that recovery plan for a purpose that has nothing to do with determining jeopardy. The actions that are recommended in the recovery plan are directed toward planning for the recovery of the spotted owl. They need not be considered by the Fish and Wildlife Service when it comes to determination of jeopardy. Here, the Fish and Wildlife Service was reviewing a BLM planned project. Okay, but jeopardy and the recovery plan, they do overlap at some points on the margins, right? But you're stating they're largely distinct concepts? They are distinct concepts and for purposes of this action where Fish and Wildlife's job was to review a planned sale by the BLM, but not to design its own sale. It's only reviewing a plan that BLM intends to implement. Clearly, it was appropriate for Fish and Wildlife to determine whether the actions here were consistent with the recovery plan. The recovery plan encourages agencies to take actions that will advance the resiliency of habitat lands and that will have long-term benefits for the environment, even at the cost of short-term costs as we cited in our brief. When you were assessing jeopardy of whether the timber harvest would jeopardize spotted owls, did the FWS assume a range applicable to unburned forests? Did you do that? Your Honor, I believe what the question is going to is the issue whether the Fish and Wildlife Service ignored science that suggests that owls would range beyond their ordinary home ranges in a burned landscape. There is one study to that effect in the record and the Fish and Wildlife Service relied on that study and further studies by the same investigator and a later investigator who relied on the data for that study for a number of its conclusions. It did not, however, conclude as the appellants would have insisted that it conclude that the 1.3 mile radius for the home range that was assumed here would expand in a burned landscape because the burned landscapes that were studied in the 2007 Clark study assumed home ranges that were only about half the size of what was protected in this case. Those results therefore were not considered directly applicable here. What was applicable were conclusions regarding the use, the change and shifting use of the habitat within the larger home range that was considered here. Is your position that they're trying to require agencies to create a methodology in order to account for the potential shortcomings of existing data or what are they asking from your view and why what they're asking, why isn't it required? What they seem to be objecting to is the use of demographic survey data. There's an extremely large body of highly reliable demographic survey data underlying the planned project here and that's because the highest intensity fires in the Douglas complex affected an area that has been for more than two decades surveyed intensively for spotted owl activity and the spotted owl problem, barred owls invaded the area during the period of this long term study. So there have been long occupied sites and sites that were once occupied that are still surveyed for future occupancy that predated any invasion by barred owl but the biological opinion also explains that the survey protocol was altered when it was determined that this barred owl were having this effect. So this idea that something... I don't think it altered to account, I think that's the primary objection that opposing council has that there was no adequate explanation given for how the study was conducted in view of the barred owl existence. That is correct. There is no explanation of what the change was in the protocol and there's no requirement that there be any such explanation. This is a scientific document and the investigators who developed the data have done so over a period of decades, noted a problem, noted that they would need to alter their or revise their protocol to account for that problem. There is no requirement in the Endangered Species Act that they then explain to the public what the protocol is, how it's done now in order to change the way that it is able to detect spotted owls in the presence of barred owls. But you aren't saying that the protocol doesn't have to be explained. You're not saying that, are you? Well actually, Your Honor, I am saying that the protocol doesn't necessarily have to be developed. And the data span a period of decades, are intensively monitoring the same areas over and over because of spotted owl site fidelity, which gives investigators a lot of information useful to them for future predictions based on past activity. And here we have an example of a barred owl site. There's no evidence that the investigators became less effective when the difficulty that was posed by the barred owl invasion became apparent. And there is no study that says that these demographic data are no longer reliable. There is nothing. There is no scientific information that was overlooked here. So as I understand it, the issue was that if the barred owl is present in the area, the spotted owl doesn't necessarily respond to survey prompts. That's correct, Your Honor. Go ahead. Making it more difficult for investigators to find the spotted owls that are out there. But the Fish and Wildlife Service, because of the long experience of these investigators and because of the effectiveness of these protocols, believes that it's entitled to great confidence in these survey data, some of which are used to identify sites and protect them, that have been in use by spotted owls since long before the barred owls were even present in this area. So I'm just curious as to how could the Fish and Wildlife Service be confident that the survey results were not affected by the presence of the barred owl? I don't think there is any claim that they were not affected by the presence of the barred owl, and there is no requirement that the survey data be perfect. These are the best scientific data available. They have taken into account the changed ecological circumstances due to both the fire and the barred owl invasion. How did they take into account the effect of the presence of the barred owl? How did the study take into effect the presence of the barred owl? The biological opinion says that the protocols have been revised to account for it. It does not explain how, and it doesn't need to explain how, Your Honor. It needs to use the best scientific data and information available, and it did that. And I would like to give the rest of the time to Mr. Horngren. Okay, he'll get five minutes. Thank you, Your Honor. Scott Horngren on behalf of the interveners. Approximately at this point, 85% of the work on the project is complete. There is some additional work to do. That's not moot. So it's not moot, and in fact, one of the reasons why additional work is not ongoing is because one of the design features of the project was there won't be any harvest during the owl nesting season. So around mid-June, beginning of June, they will lift the restrictions in one of the sale areas and harvest will continue. On the barred owl, we're using the word protocol a little loosely here, and under the term of VARD and Fish and Wildlife Service, they view protocol as do you go out at night, how many surveys do you do, and all the rest, not how the Fish and Wildlife Service considered the information about the barred owl not responding in their analysis and their opinion. That would be a little troubling to me if the government were to take the view we don't have to explain how we adjusted the process to get reliable information in view of the existence of the barred owl. And I agree with you, and I just want to make very clear that if you dig into that biological opinion, they address the issue about where the owls are located. After a fire, it's hard to tell, and here's how they do that. They considered the location of the owl habitat as it was before the fire, and that gives them some idea. So if this area was a big old growth area after the fire, maybe they would focus on that. They looked at the condition of the habitat after the fire. They considered that the spotted owl had high site fidelity, and they also considered abiotic factors, they call them, such as where do the owls hang out? Down in the streams in the riparian areas, at the lower ends of the slopes, and at lower elevations. And what they did is they used that information about owl use and occupancy to help design their project. And the biological opinion contains, and that discussion is excerpt of record 72 and 173. At excerpt of record 171-175, the biological opinion contained an entire appendix describing how owls use or don't use the forest following a fire. So they did consider that information, and the conclusion after all this was, as Clark explained, given the large degree of variability in forest types, fire hazards, fire intensities, additional studies are needed before definitive conclusions can be reached. And so this is a case where there's developing science on how owls use forest, and that the Supreme Court has urged courts to be at their most deferential to the analysis that the agency does on the frontiers of science. So the items that you delineated, were those a part of the survey process? Those aren't a part of the survey process. They did surveys through 2014, but to identify the home range takes, you've got to put a radio collar on the owl. These have a little band on them, they color coded them because they're in a study area, but if you really want to know where the home range is, you've got to put a radio collar on them and follow the owls for a year or more. They didn't have the time because the trees were deteriorated, so they used the best information available, which was surveys before the fire burned, and they indicated that if the surveys after the fire burned indicated that the owls were in a conflict with a particular area, that they would adjust the particular harvest. So this wasn't just a cook the books exercise that they did. I'd like to conclude by urging the court to consider three things here as you draft your opinion, context, context, and context, and you have addressed in your Environmental Protection Information Center and your Butte Environmental Center cases, this issue of what is the best and what are the effects on the owl, not just on a particular site, but across a wide area, and I'll give you three examples. First of all, in terms of context, Judge Hawkins mentioned Judge Dwyer's decision involved old growth, and here the unburned forest is not being cut. That's one of the design features they said, we're not going to cut the unburned forest. In fact, we're not even going to cut the lightly burned forest. We're going to focus on the stuff that was burned intensively, that they call post-forage fire habitat, which they haven't used before, but it doesn't have the multi-structure, it doesn't have the canopy. The other thing they did in terms of the context is, they looked at the 500 acres they call the core use area of the owl, where the owl concentrates most, and they tried to avoid putting units in those core use areas. Lastly, on the context, they focused on, or your cases focus on, what's going to be the impact on the species, not a particular owl, or the entire critical habitat unit. In this particular case, we're talking about 33 acres of harvest, of nesting, roosting, foraging, and approximately 1600 acres of this post-fire foraging habitat, which is unburned forest. Compare that, as they did in biological opinion, to the critical habitat unit in this case, which is on ER 93, where that unit is 1,970,000 acres, or to the Klamath Province, which is where they look at the population, which is 844,000 acres. It's a very small portion, and then lastly, in the- You said lastly twice. Could you wrap up? Over my time. Yes, you are. But I wanted to ask you one question before you left the lecture. Where would I look in the biological opinion to find out where the Forest Service discussed the barred owl and how the survey results were, how the survey results were obtained in view of the barred owl problem? Where would I look in the biological opinion for that? Page 73 and 72, in that, excuse me, ER, because it's not, and then in 173, ER, and in the appendix, and they discussed that. All right, thank you, counsel. Rebuttal? Sorry. Thank you, Your Honors. Defendant intervenors urge you to consider context in this case, and I would agree that context is important, and in this particular case, we are talking about the authorized incidental take of 18 percent of the remaining population of spotted owls in the Klamath Demographic Study Area. And this is the same population of spotted owls that demographers have concluded is demonstrating an alarming decline, and that this suggests that this is no longer a stable population. So when we're talking about context, we're talking about a listed species that is seriously on the brink of extinction. So I think context is important here. Your Honor, Judge Hawkins asked where we cited the Bartell case. This is Southwest Center for Biological Diversity v. Bartell. It's cited in our opening briefs at pages 35 and 39, and our reply briefs at page 14 and 16. Thank you. Thank you, Your Honor. First of all, the federal government basically states that recovery plans are simply policy documents and that they really don't matter, and I would like to disagree with that. As the recovery plan itself states, quote, recovery plans describe reasonable actions and criteria that are considered necessary to recover listed species. So again, the recovery plan itself does talk about its importance and how that should be relevant to jeopardy decisions or, excuse me, jeopardy analysis under Section 7 of the Endangered Species Act. I would also like to reiterate that plaintiff appellants are not criticizing the survey data here. We agree that the survey data is the best available information. The problem comes when that information overlooks a scientific issue, in this case the Bartell confounding survey results. You're going to end up getting false negative results, i.e. there's no spotted owl anymore at this location because of Bartells. Fish and Wildlife knows that this is an issue. It should have been discussed in the biological opinion. It was not. It is simply stated, yep, we have a Bartell problem. We've done these surveys. Here's our jeopardy analysis. There's no rational connection between those things, and that's what's required here in order to issue a lawful jeopardy opinion. So really here, Fish and Wildlife Service should have recognized that spotted owl surveys are very important, but they are not the only thing that we need to be considering. We need to consider that, in fact, sometimes we're getting false negatives here, and because the survey data was so important to the way in which the Fish and Wildlife Service assessed jeopardy in this case, there is a possibility here that the jeopardy analysis did not fully consider all facts and all rational information that it should have in reaching the jeopardy analysis. Defendant interveners also note that this is a relatively small amount of harvest here. I would disagree with that characterization, and in fact, this court in Alliance for the Wild, Rockies v. Cottrell, rejected a similar small-scale analysis and indicated that this is not a de minimis injury at all, and I would also, again, reiterate context. We're talking about a spotted owl population here that is exhibiting an alarming decline. This is a species that we've been putting a lot of energy and effort into trying to And here we have a decision that in fact authorizes the take of 18% of that remaining population, and I'd point out that nowhere in this litigation has Fish and Wildlife Service attempted to explain that we can survive an 18% decline, we can survive an 18% additional take from this population that's exhibiting a decline, and so Fish and Wildlife Service has not been able to demonstrate that there is no irreparable harm in this case, Your Honors. So with that, I see that my time is up, and unless you have any further questions, I will rest. Pierce and I thank you. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Hawkins, Rawlinson, Callahan